# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

UNITED STATES OF AMERICA
and STATE OF MICHIGAN,

                 Plaintiff,                      Case No. 12-cv-13984

and                                         Hon. Victoria A. Roberts

 *Ex. Rel.* NEAL ELKIN,

                 Plaintiff/Relator,

v.

SELECT MEDICAL HOLDINGS,
CORP., a foreign profit corporation,
SELECT MEDICAL, a foreign profit
Corporation, and SELECT SPECIALTY
HOSPITAL – ANN ARBOR, INC.,
a foreign profit corporation,

                 Defendants.

## QUI TAM ACTION - FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)
## DO NOT PLACE IN PRESS BOX
## DO NOT ENTER ON PACER

---

## FIRST AMENDED FEDERAL FALSE CLAIMS ACT AND MICHIGAN MEDICAID FALSE CLAIMS ACT COMPLAINT AND DEMAND FOR JURY TRIAL

## Introduction

1. Dr. Neal Elkin ("Relator" or "Dr. Elkin") brings this action on behalf of the United States of America and the State of Michigan against Defendants Select Medical Holdings, Corp. ("Select Holdings"), Select Medical, and Select Specialty Hospital – Ann Arbor, Inc. ("Select Ann Arbor") (all Defendants are referred to collectively as "the Select Medical entities" or "Defendants") for treble damages and civil penalties arising from Select Medical's false statements and false claims in violation of the False Claims Act, 31 U.S.C. § 3729 *et seq*. and the Michigan Medicaid False Claims Act, MICH. COMP. LAWS § 400.601 *et seq.*

2. This First Amended Complaint details violations of the False Claims Act, 31 U.S.C. § 3729 *et seq*. and the Michigan Medicaid False Claims Act, MICH. COMP. LAWS § 400.601 *et seq.*, arising out of the false certification of medically unnecessary procedures.

3. In addition, this First Amended Complaint details violations of the retaliation provisions of the False Claims Act, 31 U.S.C. § 3730(h), and the Michigan Medicaid False Claims Act, MICH. COMP. LAWS § 400.610c.

4.     The Select Medical entities engaged in a number of improper practices under the False Claims Act, the Patient Protection and Affordable Care Act, and the Michigan Medicaid False Claims Act. Specifically, Select Medical requires patients to be kept on ventilators for the express purpose of increasing reimbursement and regardless of medical necessity. This practice is known, based on Relator's direct and personal knowledge, to occur in Select Medical's Ann Arbor location, and is believed to occur in other locations as well.

## Jurisdiction and Venue

5.     This action arises under the False Claims Act, 31 U.S.C. § 3729 *et seq.* and the Michigan Medicaid False Claims Act, MICH. COMP. LAWS § 400.601 *et seq.* This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This Court also has jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of the Michigan state law claims under 29 U.S.C. § 1367.

6.     Venue is proper in the Eastern District of Michigan pursuant to 31 U.S.C. § 3137(a), because the acts proscribed by 31 U.S.C. § 3729 *et seq.* and complained of herein took place in this District, and is also proper pursuant to 28 U.S.C. § 1391, because at all times material and

relevant, Defendants transacted and continues to transact business in this District.

**The Parties**

7.  Relator Dr. Neal Elkin ("Relator") is a board certified doctor of internal medicine. He graduated in 2003 from the University of Michigan Medical School and thereafter completed his residency in internal medicine. Dr. Elkin began working at Select Ann Arbor as an independent hospitalist in 2010.

8.  Relator is an original source of this information to the United States. He has direct and independent knowledge of the information on which the allegations are based and voluntarily provided the information to the Government before filing an action under the False Claims Act.

9.  The United States, through the Department of Health and Human Services ("DHHS"), administers the federal Medicare program, which is a health insurance program funded by taxpayer revenue. Medicare assists state governments with the payment of medical services for persons over the age of 65 and others who qualify under the Medicare program.

10. Select Medical Holdings Corporation ("Select Holdings") is the parent company to Defendant Select Medical and its network of long-term

acute care hospitals. Based in Mechanicsburg, Pennsylvania, as of the original filing of this action in 2012, Select Medical had an estimated 29,115 employees throughout the United States and operated an estimated 111 long-term acute care hospitals in twenty-eight states.

11. Select Specialty Hospital – Ann Arbor, Inc. ("Select Ann Arbor"), as of the original filing of this action, was a 36-bed, state-licensed hospital serving Western Wayne County and the Ann Arbor area. As of the original filing of this action in 2012, Select Ann Arbor was located inside of St. Joseph Mercy Hospital ("St. Joseph") on Floor 7 North. One of the services Select Ann Arbor provides is "pulmonary/ventilator weaning."

**Statutory Requirements that Provide Basis for Relator's Claim**

12. The United States, through the Department of Health and Human Services ("DHHS"), administers the Hospital Insurance Program for the Aged and Disabled established by Part A ("Medicare Part A Program") and the Supplementary Medical Insurance Program established by Part B ("Medicare Part B Program") and Title XVIII of the Social Security Act under 42 U.S.C. § 1395 *et seq.*

13. The Medicare Part A and Medicare Part B programs are federally-financed health insurance systems for persons who are aged 65 and over

and those who are disabled, including those with End Stage Renal Disease ("ESRD").

14. DHHS has delegated the administration of the Medicare Program to the Center for Medicare and Medicaid Services ("CMS"), a component of DHHS. Another component of DHHS, the Office of Inspector General ("OIG"), is responsible for investigating Medicare fraud and abuse, as well as issuing regulations and instructions that implement the Medicare fraud and abuse authorities.

15. Medicare Part A provides basic insurance for the costs of hospitalization and post-hospitalization care. 42 U.S.C. § 1395c-1395i-2 (1992). Medicare Part B is a federally-subsidized, voluntary insurance program that covers the fee schedule amount for laboratory and a wide range of outpatient services. 42 U.S.C. §§ 1395(k), (i), (s).

16. Reimbursement for Medicare claims is made by the United States through the Centers for Medicare Services ("CMS"). CMS, in turn, contracts with private insurance carriers to administer and pay Medicare Part B claims from the Medicare Trust Fund. 42 U.S.C. § 1395(u). In this capacity, the carriers act on behalf of CMS. 42 C.F.R. § 421.5(b). Most hospitals, including Select Medical and Select Ann Arbor, derive

a substantial portion of their revenue from the Medicare program and from the State of Michigan Medicaid Program.

17. In order to receive Medicare funds, enrolled suppliers (including Defendants together with their authorized agents, employees, and contractors) are required to abide by all of the provisions of the Social Security Act, the regulations promulgated under the Act, and all applicable policies and procedures issued by the states.

18. Among the rules and regulations that enrolled suppliers (including Defendants together with their authorized agents, employees, and contractors) agree to follow are: (a) bill Medicare Carriers for only those covered services that are medically necessary; (b) not bill Medicare Carriers for any services or items that were not performed or delivered in accordance with all applicable policies, nor submit false or inaccurate information relating to provider costs or services; (c) not engage in any act or omission that constitutes or results in over-utilization of services; (d) be fully licensed and/or certified under the applicable state and federal laws to perform the services provided to recipients; (e) comply with state and federal statutes, policies and regulations applicable to the Medicare program; and (f) not engage in any illegal activities related to the furnishing of services to recipients.

19. Under the Medicare Program, CMS makes payments retrospectively (after they are rendered) to hospitals for inpatient services. In order to establish a hospital's eligibility to participate in the program, Medicare enters into provider agreements with a given hospital. However, the contract between Medicare and the hospital is not an agreement to provide particular services for particular patients. Any benefit from those services is derived solely by the patients and not by the United States or the Medicare program.

20. In order to receive payment from Medicare, CMS requires hospitals to annually submit CMS-2552, known as a Hospital Cost Report. Cost Reports are the final claim made to fiscal intermediaries, with whom CMS contracts, for payment for services provided to Medicare beneficiaries.

### *False Claims Act*

21. Medicare will not pay for services that are "not reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395y(a)(1)(A). Certification of payment for medically unnecessary or unreasonable services is a false claim. 31 U.S.C. § 3729.

22. At the time of the original filing of this action in 2012, the False Claims Act provided that any person who knowingly submits a false or

fraudulent claim to the Federal Government for payment or approval is liable to the government for a civil penalty of not less than $5,500 and not more than $10,000 for each claim, plus three times the actual damages that the government sustained. 31 U.S.C. § 3729(a). The False Claims Act also permits assessment of the civil penalty even without proof of specific damages.

23. A defendant acts knowingly when it has actual knowledge of the information, acts in deliberate ignorance of the truth or falsity of the information, or acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1). No specific intent to defraud is required. *Id.*

24. The act of submitting a claim for reimbursement implies compliance with the federal rules and regulations that are a precondition to payment. *See Mikes v. Straus*, 274 F.3d 687, 699 (2d Cir. 2001).

25. Medical necessity is a precondition of payment under the Medicare program. The Medicare statute states that "no payment may be made under part A or part B of this subchapter for any expenses incurred for items or services which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A).

26. In addition, the False Claims Act prohibits a defendant from "knowingly [making, using or causing] to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceal[ing] or knowingly and improperly avoid[ing] or decree[ing] an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). This provision is known generally as a "reverse false claim."

27. For the reasons stated herein, Defendants have, in reckless disregard or in deliberate ignorance of the truth or the falsity of the information involved, made or used false or fraudulent records and statements in order to get false or fraudulent claims paid and/or approved. Such conduct violates the False Claims Act. 31 U.S.C. §§ 3729(a)(1), (a)(1)(G), and (a)(2).

### *The Patient Protection and Affordable Care Act*

28. The Patient Protection and Affordable Care Act ("PPACA") requires that overpayments to doctors or suppliers, including hospitals, be identified and returned to the United States.

29. An overpayment is a payment that has been received in excess of the amounts the doctor or entity is due under Medicare law and regulations.

Overpayments can result from, among other things, payment received from medically unnecessary services.

30. Section 6402(a) of the PPACA dictates that overpayments made under the Medicare and Medicaid programs that are received by "any provider, supplier, Medicaid managed care organization, Medicare Advantage organization, or [Prescription Drug Plan] sponsor" must "be reported and returned" within sixty days to the "Secretary, state, intermediary, carrier or contractor" after the overpayments have been identified. Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 6402, 124 Stat. 753, 755-56 (2010).

31. The returned overpayment must also be accompanied by a written explanation of the reason for the overpayment. Failure to timely comply with section 6402(a) is a "false claim" under section 3729, subjecting defendants to liability under the False Claims Act.

***Whistleblower Protection Under the False Claims Act***

32. The False Claims Act protects whistleblowers from the retaliatory conduct of their employers.

33. The retaliation provision of the False Claims Act protects an employee or contractor from being "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and

conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h).

34. Relief for violating this section includes reinstatement of the employee, contractor, or agent with the same level of seniority that person would have had but for the discriminatory conduct, as well as double damages for back pay, interest on back pay, and special damages. Relief also includes reasonable attorneys' fees. 31 U.S.C. § 3730(h)(1)(b).

### *Corporate Integrity Agreement*

35. On August 31, 2011, Select Medical entered into a Corporate Integrity Agreement ("CIA") with the Office of Inspector General of the Department of Health and Human Services.

36. The CIA applies to each of Select Medical's long-term acute care hospitals in which Select Medical has an ownership or control interest, as defined in 42 U.S.C. § 1320a-3(a)(3). This includes Select Ann Arbor.

37. The period of the compliance obligations assumed by Select Medical under the CIA is five years from the effective date of the CIA, or five years from August 31, 2011.

38. The purpose of the CIA is to promote compliance with the statutes, regulations, and written directives of Medicare, Medicaid, and all other Federal health care programs.

39. The CIA requires Defendants to identify and repay to the Federal Government any overpayments it receives. The CIA specifically states: "If, at any time, Select [Medical or its affiliates] identifies any Overpayment, Select shall repay the Overpayment to the appropriate payor (e.g., Medicare fiscal intermediary or carrier) within 30 days after identification of the Overpayment and take remedial steps within 60 days after identification (or such additional time as may be agreed to by the payor) to correct the problem, including preventing the underlying problem and the Overpayment from recurring."

40. The CIA also requires Defendants to disclose a number of reportable events, including, among other things, a substantial overpayment and any "matter that a reasonable person would consider [to be] a probable violation of criminal, civil, or administrative laws applicable to any Federal health care program for which penalties or exclusion may be authorized."

41. The CIA also requires Defendants to comply with the Stark laws, which regulate referral relationships, and it requires Select Medical to

voluntarily report violations and probable violations to the appropriate entity.

### Allegations as to the Scope, Method and Duration of Defendants' Fraudulent Practice and Fraudulent Intent

**A.** *Defendants Force Patients to Remain on Ventilators When It Is Medically Unnecessary to Do so for the Purpose of Increasing Reimbursements, and Corporate Encourages Each of Its Local Operations to Do so Based on Policies and Incentives in Place*

42. Defendants have adopted a policy and practice of keeping respiratory patients on ventilators longer than is medically necessary and/or safe in order to increase the fees they receive for, among other things, patient admissions.

43. Select Medical's corporate office encourages each of its local hospitals to keep respiratory patients on ventilators longer than is medically necessary and/or safe based on policies and practices it has in place for each of its local hospitals.

44. Despite knowing about this fraudulent practice, the pulmonologists working at St. Joseph did not challenge the reimbursement scheme, but actively participated in it.

45. Evidence of Defendants' illegal practice can be found at Select Ann Arbor. This practice was explicitly memorialized by the lead respiratory therapist in January 2012. The lead respiratory therapist wrote, in

pertinent part: "Please make sure: no ventilators are discontinued before 96 hours from the exact time of admit, said patient must also be on the ventilator at least 1 hour for every 24 hours from the exact time of admit for them to count as a vent for us!"

46. The January 2012 memo also specifically addressed the reimbursement Select Ann Arbor receives if it keeps a patient on a ventilator for at least one hour per every twenty-four hours for ninety-six hours after admission and that Select Medical monitors the local hospitals' activity in this regard: "If we fail to do this [keep patients on a ventilator for 96+ hours] the vent does not count for us at all! This means no reimbursement for the vent, which means corporate will reduce our staffing because we are not running an appropriate vent load level."

47. Regarding patient care, the January 2012 memo goes on to state: "I know we all want to provide optimal care for our patients and I am sure we all get excited when our patients start off weaning well, but do keep in mind the parameters we must follow in order for us to get properly compensated for the work we do."

48. A second memo from February 2012 reiterates that "we will now be placing all patients who are new admits on the vent at night for the first five nights after admit (no exceptions)."

49. The February 2012 memo also demonstrates that pulmonologists were aware of the practice and were advised on the best way to minimize the impact to patient health while still performing the unnecessary ventilator service.

50. Despite being aware of the fraudulent practice, the Pulmonary Critical Care Associates ("PCCA") consulting at St. Joseph ("pulmonary group" in the memo), as well as the other pulmonologists working at St. Joseph did not take any measures to end the practice. Instead, as the February 2012 memo indicates, they not only consented, but directed respiratory therapists to utilize a certain type of ventilator setting: "spont."

51. By promoting the fraudulent practice, the pulmonary group and the pulmonologists working at St. Joseph were able to increase their own reimbursements through Select Medical's Ann Arbor facility.

52. Defendants' policy and practice of forcing patients to remain on a ventilator for ninety-six or more hours was for the sole purpose of increasing its reimbursements. For example, at Select Ann Arbor, when a patient is admitted who is in respiratory distress but does not need the assistance of a ventilator, Select Ann Arbor receives an admission fee from Medicare of approximately $40,000. However, when a patient is admitted on a ventilator and remains on that ventilator (at least one hour

per day) for ninety-six hours, or four days, Select Ann Arbor receives an admission fee of approximately $80,000.

53. Thus, a strong financial incentive exists for Select Medical and its local affiliates, including Select Ann Arbor, to keep a patient on a ventilator for ninety-six hours after admission regardless of whether the ventilator is medically necessary or in the patient's best interest.

54. This policy and practice is intended for the purpose of increasing the reimbursement Defendants receive from the Federal Government, as well as from private insurance providers.

55. While this illegal practice is known to Relator to occur at Select Ann Arbor, the memos suggest that it took place at the encouragement of Select Medical's corporate parent and that this illegal practice also occurs at other Select Medical affiliates. Indeed, the above-described January 2012 memo distributed at Select Ann Arbor specifically states that if Select Ann Arbor did not carry the appropriate vent load level, "corporate" would get involved and reduce staffing. This is evidence that the policy and practice at Select Ann Arbor is much more widespread than Select Ann Arbor, and also applies throughout Select Medical and its affiliates. In addition, Select Medical entered into the above-described CIA in settlement of alleged false claims violations at

its Columbus, Ohio facility. The CIA requires Select Ann Arbor to identify, report, and repay any overpayments it receives from the Federal Government.

## Allegations Relating to Defendants' Retaliatory Motive

56. After Dr. Elkin complained about medically unnecessary care (as described above), he was isolated in the workplace.

57. After he complained, Defendants deliberately stopped assigning Dr. Elkin new patients.

58. Thereafter, Dr. Elkin met with Select Ann Arbor's CEO, John O'Malley, about the issue. Despite Dr. Elkin directly asking why he was not being assigned new patients, Mr. O'Malley provided inconsistent reasons why Dr. Elkin was not being assigned new patients and explicitly encouraged him to consider employment elsewhere.

59. Dr. Elkin was not assigned any new patients from January 24, 2012 through February 24, 2012. Before his complaints, Dr. Elkin had previously been assigned to treat approximately four new patients per month at Select Ann Arbor in addition to patients he was already treating.

60. Dr. Elkin later learned from Select Ann Arbor's Sales Manager, Debbie Duncan, that Select Ann Arbor's CEO, John O'Malley, had instructed her not to give Dr. Elkin any new patients.

61. Dr. Elkin questioned Mr. O'Malley, and Mr. O'Malley admitted that he had ordered the sales manager in January 2012 not to assign Dr. Elkin any new patients. However, Mr. O'Malley backtracked in late February 2012 and promised to start giving Dr. Elkin new patients again.

62. After this, Dr. Elkin was only assigned approximately six new patients. His last new patient admission was on or around April 20, 2012.

63. From the beginning of 2012, other physicians in the same rotation as Dr. Elkin were assigned dozens of new patients. On information and belief, these physicians had not filed written incident reports regarding patient care or otherwise challenged the policies and practices at Select Ann Arbor that impacted the quality of care or the amount that Select Ann Arbor receives in reimbursement from the Medicare and Medicaid programs.

64. In June 2012, Dr. Elkin again inquired about why he was not being assigned new patients. Select Ann Arbor's CEO, John O'Malley, told Dr. Elkin that one of the reasons he was not being assigned new patients was that he kept his patients at Select Ann Arbor for too long.

A longer length of stay is sometimes necessary from a clinical perspective, but it decreases the amount of revenue per patient.

65. Dr. Elkin is apparently the only physician who filed a written incident report regarding patient care at Select Ann Arbor in at least the ten months preceding the original filing of this action in 2012. Soon before the original filing of this action in 2012, Select Ann Arbor CEO John O'Malley informed Dr. Elkin that he would not be assigned any new patients after his <u>one</u> current patient was released.

66. Soon thereafter, Dr. Elkin left a message with Debbie Duncan, Select Ann Arbor's Sales Manager, inquiring about why a new patient was not assigned to him. Ms. Duncan left the following message in response to Dr. Elkin's call on August 14, 2012:

   a. "Hi Dr. Elkin, it's Debbie calling from Select Specialty Hospital. I got your message yesterday and I wanted to let you know that you have been taken off the rotation which John [Select Ann Arbor's CEO] informed me that you have had that conversation with him. You will not be getting any more patients at our facility. And also, that patient was a direct referral from IHA because they were seeing the patient downstairs as well. So I apologize to inform you

of that. If you have any other questions you can talk to John regarding that. Thank you."

67. Defendants' refusal to assign Dr. Elkin any new patients and refusal to reassign his former patients to him was in retaliation for complaints Dr Elkin raised to Defendants regarding patient care.

## COUNT I
## VIOLATION OF THE FALSE CLAIMS ACT

68. Relator realleges and incorporates the previous paragraphs 1-67 by reference.

69. As described above, Defendants violated the False Claims Act by knowingly presenting or causing to be presented claims for payment to the United States government based on the medically unnecessary continuation of patients on ventilators for ninety-six or more hours following the patient's admission.

70. Defendants acted in deliberate ignorance of the truth or falsity of the information and/or in reckless disregard of the truth or falsity of the information when they presented or caused to be presented to the United States government claims for reimbursement based on a widespread policy and practice across their local facilities of forcing patients to remain on ventilators when it was medically unnecessary to do so for the purpose of increasing reimbursements. Defendants

continued to engage in this practice even after entering into a Corporate Integrity Agreement with the Government. Defendants' practice is evidenced, in part, by the memo distributed at their Select Ann Arbor location, as well as the documented practices at that location.

71. Defendants falsely certified that keeping patients on a ventilator for ninety-six or more hours following the patient's admission was medically necessary when they submitted claims for payment to the government, in violation of Medicare regulations.

72. Defendants made these representations in order to obtain payment of funds to which it would not otherwise be entitled.

73. This course of conduct violated the False Claims Act. 31 U.S.C. § 3729 *et seq*.

74. The United States Government, unaware of the falsity of the claims and/or statements, and in reliance on the accuracy thereof, was damaged to the extent that these funds paid for services were not reimbursable by Medicare.

## COUNT II
## REVERSE FALSE CLAIMS

75. Relator realleges and incorporates the previous paragraphs 1-74 by reference.

76. Defendants had a duty to identify and repay the Federal Government for any overpayments they received per the Corporate Integrity Agreement described above.

77. Defendants' duty arose on August 31, 2011, prior to the reverse false claims at issue in this case.

78. Compliance with the CIA is an explicit prerequisite to Defendants' eligibility for repayment.

79. After Defendants' duty arose, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, and/or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government. Specifically, Defendants certified in reports they were required to submit under the CIA that they were complying with the terms of the CIA as well as applicable Medicare regulations.

## COUNT III
## FAILURE TO REPORT OR RETURN MEDICARE OVERPAYMENTS

80. Relator realleges and incorporates the previous paragraphs 1-79 by reference.

81. As described above, Defendants received overpayments from the United States Government by submitting claims that falsely certified that it was medically necessary to keep newly admitted patients on ventilators for ninety-six or more hours.

82. Defendants have knowledge of or have identified that overpayments were made to them since at least January 2012, when Defendants' staff released the ventilator memo, as well as when Relator raised concerns about Defendants' practices.

83. Defendants failed to report or return the overpayments to the United States Government within the required sixty days.

84. Defendants' practice of submitting false claims, as described above, may date back as far as the ten years preceding the original filing of this action and may be widespread across all their locations.

85. Defendants' course of conduct violates the PPACA.

86. The United States Government, unaware of the falsity of the claims and/or statements upon which it made payments, was damaged and continues to be damaged to the extent that the overpaid funds it disbursed are not being reported or repaid by Defendants.

## COUNT IV
## RETALIATION AGAINST RELATOR IN VIOLATION
## OF THE FALSE CLAIMS ACT (31 U.S.C. § 3730(h))

87. Relator realleges and incorporates the previous paragraphs 1-86 by reference.

88. Defendants stopped assigning Dr. Elkin new patients altogether in and around January 2012 at the direction of Select Ann Arbor's CEO. The CEO explicitly instructed the staff at Select Ann Arbor not to assign any new patients to Dr. Elkin after he submitted complaints to Defendants.

89. Defendants thereafter assigned Dr. Elkin only two new patients. His last new patient was assigned in April 2012.

90. Soon before the original filing of this action in 2012, Select Medical informed Dr. Elkin that after the one patient he was currently treating was released, he would not be assigned any new patients.

91. Defendants informed Dr. Elkin in August 2012 that they would not be reassigning him former patients, whom he had previously treated, upon their readmission to Select Ann Arbor, which is inconsistent with Defendants' usual and customary practice.

92. Defendants' actions were retaliatory and taken because of Dr. Elkin's attempts to stop Defendants' noncompliance with the CIA, Medicare code, and the False Claims Act.

93. Dr. Elkin made it clear to Defendants that he opposed their policies, including keeping patients on ventilators longer than medically necessary and purposefully downgrading the severity of major incidents in written incident reports.

94. Dr. Elkin was outspoken in his opposition to such policies and was the only physician that expressed his concern with Defendants.

95. At one point, CEO of Select Ann Arbor, John O'Malley, expressed to Dr. Elkin that he would not be assigned new patients because he kept patients at Select Medical for too long (reducing reimbursements in effect).

96. It is clear that Dr. Elkin was retaliated against by Defendants for opposing "unnecessary" and potentially harmful policies that go against proper standards of care.

97. Dr. Elkin has been harmed and continues to be harmed in that he has suffered and will continue to suffer economic damages, as well as humiliation, outrage, and loss of professional reputation due to Defendants' conduct.

## COUNT V
## DISCHARGE IN BREACH OF PUBLIC POLICY
### (under Michigan law)

98. Relator realleges and incorporates the previous paragraphs 1-97 by reference.

99. Dr. Elkin opposed Defendants' practices and regularly complained to Defendants about substandard patient care.

100. After Dr. Elkin opposed the above-described practices, Defendants constructively discharged him by explicitly refusing to assign him any new patients. Before he complained, Dr. Elkin had been treating approximately four new long-term care patients per month. After voicing his opposition to the Defendants' practices, Defendants referred him only a handful of new patients and explicitly stated that Dr. Elkin would no longer be assigned new patients. After Dr. Elkin's last patient was released, Defendants altogether stopped referring patients to him, resulting in the effective termination of his employment.

101. Dr. Elkin has been harmed and continues to be harmed in that he has suffered and will continue to suffer economic damages, as well as humiliation, outrage, and loss of professional reputation as a result of Select Medical's actions.

**COUNT VI**
**CLAIMS OF THE STATE OF MICHIGAN**
**VIOLATION OF THE MICHIGAN MEDICAID FALSE CLAIMS**
**ACT**
**(MICH. COMP. LAWS §§ 400.601 *et seq.*)**

102. Relator realleges and incorporates the previous paragraphs 1-101 by reference

103. As explained in detail in Paragraphs 42-55 above, Defendants violated the Michigan False Claims Act by knowingly presenting or causing to be presented claims to the State of Michigan government based on the medically unnecessary continuation of patients on ventilators for ninety or more hours following the patient's admission, in violation of MICH. COMP. LAWS § 400.603(1)–(3).

104. Section 400.603 of the State of Michigan's Medicaid False Claims Act provides in part:

    (1) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact in an application for Medicaid benefits.

    (2) A person shall not knowingly make or cause to be made a false statement or false representation of a material fact for use in determining rights to a Medicaid benefit.

    (3) A person, who having knowledge of the occurrence of an event affecting his initial or continued right to receive a Medicaid benefit or the initial or continued right of any other person on whose behalf he has applied for or is receiving a benefit, shall not conceal or fail to disclose that event with intent to obtain a benefit to which

the person or any other person is not entitled in an amount greater than that to which the person or any other person is entitled

\*\*\*

MICH. COMP. LAWS § 400.602(f) provides:

"Knowing" and "knowingly" means that a person is in possession of facts under which he or she is aware or should be aware of the nature of his or her conduct and that his or her conduct is substantially certain to cause the payment of a Medicaid benefit. Knowing or knowingly includes acting in deliberate ignorance of the truth or falsity of facts or acting in reckless disregard of the truth or falsity of facts. Proof of specific intent to defraud is not required.

105. As set forth herein, Defendants have violated the Michigan Medicaid False Claims Act, MICH. COMP. LAWS §§ 400.603(1), 400.603(2), and 400.603(3) by knowingly making or causing to be made false statements or false representations of material facts for use in determining rights to Medicaid benefits with the intention of obtaining Medicaid benefits.

106. For each violation of the Michigan Medicaid False Claims Act, the State of Michigan is entitled to recover from Defendants a civil penalty of not less than $5,000 and not more than $10,000 plus triple the amount of damages suffered by the State as a result of Defendant's conduct. MICH. COMP. LAWS § 400.612(1).

**COUNT VII**
**RETALIATION AGAINST RELATOR IN VIOLATION**
**OF THE MICHIGAN MEDICAID FALSE CLAIMS ACT**
**(MICH. COMP. LAWS § 400.610c)**

107. Relator realleges and incorporates the previous paragraphs 1-106 by reference.

108. Following Dr. Elkin's ongoing objections to Defendants' unethical and illegal conduct, in January 2012, Defendants stopped assigning him new patients altogether at the direction of Select Ann Arbor's CEO. The CEO explicitly instructed the staff at Select Ann Arbor not to assign any new patients to Dr. Elkin.

109. Defendants thereafter assigned Dr. Elkin only two new patients. His last patient was assigned in April 2012.

110. Defendants informed Dr. Elkin soon before the original filing of this action in 2012 that after the one patient he was currently treating was released, they would not assign him any new patients.

111. In addition, Defendants informed Dr. Elkin in August 2012 that they would not be reassigning him patients whom he previously treated upon their readmission to Select Ann Arbor, which is inconsistent with Defendants' usual and customary practice.

112. Defendants' actions were retaliatory and taken because of Dr. Elkin's attempts to stop Defendants' violations of the Michigan Medicaid False Claims Act.

113. Dr. Elkin made it clear to Defendants that he opposed many of their policies, including keeping patients on ventilators longer than medically necessary and purposefully downgrading the severity of major incidents in written incident reports.

114. Dr. Elkin was outspoken in his opposition to such policies and was the only physician that expressed his concerns with Defendants.

115. At one point, CEO of Select Ann Arbor, John O'Malley, expressed to Dr. Elkin that he would not be assigned new patients because he kept patients at Select Medical for too long (reducing reimbursements in effect).

116. It is clear that Defendants retaliated against Dr. Elkin for opposing "unnecessary" and potentially harmful policies that go against proper standards of care.

117. Dr. Elkin has been harmed and continues to be harmed in that he has suffered and will continue to suffer economic damages, as well as humiliation, outrage, and loss of professional reputation.

**RELIEF REQUESTED**

WHEREFORE, Relator respectfully requests that this Court enter judgment against Defendants Select Medical Holdings, Corp., Select Medical, and Select Specialty Hospital – Ann Arbor, Inc., as follows:

a) The United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged within this Complaint, as the Civil False Claims Act, 31 U.S.C. § 3729 *et seq*. provides;

b) That the United States be awarded the maximum civil penalty for each and every false claim that Defendants presented to the United States;

c) The State of Michigan be awarded damages in the amount of three times the damages sustained by the State of Michigan because of the false claims and fraud alleged within this Complaint, as the Michigan Medicaid False Claims Act, MICH. COMP. LAWS § 400.601 *et seq*. provides;

d) The State of Michigan be awarded the maximum civil penalty for each and every false claim that Defendants presented to the State of Michigan;

e) That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and presenting this action;

f) That the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act for which redress is sought in this Complaint;

g) That the Relator be awarded the maximum amount allowed to him pursuant to the False Claims Act and the Michigan Medicaid False Claims Act;

h) That the Relator be reinstated in the employment he was offered by Defendants and awarded any other relief applicable under the anti-retaliation provision of the False Claims Act, 31 U.S.C. § 3730(h) and the Michigan Medicaid False Claims Act, MICH. COMP. LAWS § 400.610c; and

i) That this Court award such other and further relief as it deems just and proper.

Respectfully submitted,
BLANCHARD & WALKER PLLC

/s/ David M. Blanchard
David M. Blanchard (P67190)
Frances J. Hollander (P82180)
Attorneys for Relator Neal Elkin
220 N. Main Street, Ste. 300
Ann Arbor, MI 48104
(734) 929-4313
blanchard@bwlawonline.com
hollander@bwlawonline.com

Dated: September 23, 2019

## DEMAND FOR JURY TRIAL

NOW COMES Relator, Neal Elkin, by and through his attorneys BLANCHARD & WALKER PLLC, and hereby demands a jury trial in the above-captioned matter.

Respectfully submitted,
BLANCHARD & WALKER PLLC

/s/ David M. Blanchard
David M. Blanchard (P67190)
Frances J. Hollander (P82180)
Attorneys for Relator Neal Elkin
220 N. Main Street, Ste. 300
Ann Arbor, MI 48104
(734) 929-4313
blanchard@bwlawonline.com
hollander@bwlawonline.com

Dated: September 23, 2019